[Cite as *Creveling v. Lakepark Industries, Inc.*, 2021-Ohio-764.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

Bradd Creveling, et al.

Court of Appeals No. H-20-013

Appellants

Trial Court No. CVH 20180712

v.

Lakepark Industries, Inc., et al.

**DECISION AND JUDGMENT**

Appellees

Decided: March 12, 2021

* * * * *

Daniel S. Dubow, for appellants.

Mark S. Barnes and Carl Habekost, for appellees.

* * * * *

**DUHART, J.**

{¶ 1} This case is before the court on appeal by appellants, Bradd Creveling ("appellant") and Tracey Creveling, from the July 2, 2020 judgment of the Huron County Court of Common Pleas, granting summary judgment in favor of appellees, Lakepark Industries, Inc. ("Lakepark"), Midway Products Group, Inc. ("Midway"), Kent Downing ("Downing"), and Jeff Baldridge ("Baldridge"). For the reasons that follow, we affirm.

{¶ 2} Appellants set forth five assignments of error:

I. The trial court committed reversible error by determining that no genuine issue of material facts remained as to Creveling's claim for workers' compensation retaliation.

II. The trial court committed reversible error by determining that no genuine issue of material facts remained as to Creveling's claim for disability discrimination.

III. The trial court committed reversible error by determining that no genuine issue of material facts remained as to Creveling's claim for public policy wrongful termination.

IV. The trial court committed reversible error by determining that no genuine issue of material facts remained as to Creveling's claim for employer intentional tort.

V. The trial court committed reversible error by determining that no genuine issue of material facts remained as to Tracey Creveling's claim for loss of consortium.

## Background

{¶ 3} On September 12, 2018, appellants filed their complaint against appellees, which included claims for workers' compensation retaliation under R.C. 4123.90, disability discrimination in violation of R.C. 4112.02, wrongful termination in violation of public policy, employer intentional tort, and loss of consortium.

2.

{¶ 4} On January 23, 2020, appellees filed their motion for summary judgment. On July 2, 2020, the trial court granted summary judgment in appellees' favor as to all claims in appellants' complaint.

**Statement of Facts**

{¶ 5} Appellant began employment at Lakepark, as a tool and die maker, on February 25, 2008.  Lakepark subsequently laid off appellant, for economic reasons, on or about August 11, 2010.  On or about October 4, 2010, Lakepark recalled appellant to resume working as a tool and die maker.  Prior to his employment with Lakepark, appellant was a skilled tool and die maker with over three decades of experience.

{¶ 6} Upon appellant's initial hire at Lakepark, appellant received new employee orientation, which involved, among other things, a review of Lakepark's policies, procedures, and safety training.  Over the course of his employment at Lakepark, appellant received and reviewed several copies of Lakepark's employee handbook. Appellant signed acknowledgements of receipt of the handbook on February 25, 2008 and on February 10, 2011.  Included in the handbook are general safety provisions.  In addition to these provisions, Lakepark provided safety training, both during orientation and periodically throughout the year.

{¶ 7} During his orientation, appellant watched various safety training videos, including Safety for Dummies, Right to Know, and Lockout/Tagout for Effective Personnel.  After watching the safety videos, appellant completed a series of comprehensive safety tests covering the content of the videos.  Among the topics

3.

addressed in the training was personal protection training ("PPE training"), which provided that wearing gloves while operating rotating equipment was not permitted. Appellant's test answers demonstrated that he understood not to wear gloves while operating rotating equipment, and appellant testified that he understood his answers to be the correct answers. After successfully completing the assigned safety tests, appellant signed an acknowledgment stating that he received safety orientation training, understood the safety training and Lakepark's safety requirements, and agreed to abide by the requirements.

{¶ 8} Throughout his career at Lakepark, appellant received additional, ongoing safety training, which, from time to time, included PPE training. Regarding the use of PPE on rotating equipment, Lakepark's training materials provided that, although certain tight-fitting gloves could be worn (for cut protection), it was strongly preferred that no gloves should be worn. The training materials further, and specifically, provided that Kevlar gloves, which are a cut-resistant cloth-like glove, were never to be worn on rotating equipment.

{¶ 9} In spite of these warnings, appellant testified that from the time of his hiring until September 13, 2016, he routinely wore Kevlar gloves while he was operating rotating equipment, including rotating machines known as the Bridgeport vertical milling machine (the "Bridgeport") and the profiler machine.

{¶ 10} On September 13, 2016, appellant sustained an injury to his right hand while operating a Bridgeport. The Bridgeport is a piece of rotating equipment that is

4.

used to drill and cut into steel. Prior to September 13, the Bridgeport remained in its original unmodified condition without any sort of "guarding." A safety placard located on the face of the Bridgeport directed operators not to wear gloves while operating the machine.

{¶ 11} At the time of appellant's accident, appellant was wearing Kevlar gloves while operating the Bridgeport and drilling a set of holes into a steel block. According to appellant, metal chips from the steel block wrapped around his glove, pulling his right hand into the rotating drill and mangling his hand. Appellant further states that he attempted to stop the machine by hitting the E-Stop button, but the E-Stop button fell off. He then attempted to stop the machine by hitting the brake, but this did not stop the rotating bit. Finally, appellant states, he was able to re-thread the E-Stop button and stop the machine.

{¶ 12} Directly following appellant's accident, Human Resource Manager John Curtis ("Curtis") transported appellant to the hospital. According to deposition testimony by Curtis, appellant, on the drive to the hospital, admitted that he "screwed up" and that he "knew better than to wear gloves" while operating the Bridgeport. As a result of the injury, appellant sustained an amputation of his right middle finger.

{¶ 13} Appellant did not return to work for several months. Immediately following the injury, appellant received treatment at the emergency room. Thereafter, he underwent surgeries to his right hand, including a transposition procedure, which completely removed his middle finger and moved his ring finger to the center of his hand.

5.

{¶ 14} Because appellant's injury involved an amputation, the injury constituted a recordable event under the Occupational Safety and Health Act ("OSHA"). Accordingly, Lakepark reported appellant's injury to OSHA and, as a result, OSHA investigated the incident. During an informal conference on November 29, 2016, OSHA and Lakepark reached a compromise in which Lakepark agreed to a citation for violation of PPE. As part of OSHA's and Lakepark's compromise and agreement, Lakepark placed a plexiglass shield on the Bridgeport machine.

{¶ 15} Appellant never made a formal complaint to OSHA about the workplace accident or the operation of the milling machine. During the OSHA investigation, an OSHA investigator called appellant to discuss the accident and the nature of appellant's injury involving the Bridgeport. Lakepark maintains that it was not aware of the discussion between appellant and the OSHA investigator at the time the discussion occurred, although Lakepark had, in fact, provided appellant's address and phone number to the OSHA investigator.

{¶ 16} On September 13, 2016, Lakepark filed a workers' compensation claim on appellant's behalf. From September 14, 2016 to April 24, 2017, appellant missed work while he recovered from his injuries. Appellant received compensation and medical benefits from the Bureau of Workers' Compensation throughout the period of his convalescence. Lakepark never disputed or contested any aspect of appellant's claim.

{¶ 17} During appellant's absence from work, Lakepark investigated the circumstances that gave rise to appellant's injury and determined that appellant had

6.

violated gross misconduct rule #10 of Lakepark's code of conduct, addressing "any conduct that can be construed as seriously threatening the safety and welfare of any Team Member," and, further, had violated the policy against wearing Kevlar gloves while operating rotating equipment.

{¶ 18} On April 24, 2017, Lakepark arranged a meeting with appellant and several members of management, including appellees Downing and Baldridge, Mark Wireman ("Wireman"), and Steven Zagurskie ("Zagurskie"). During the meeting, Lakepark issued appellant a final written warning, memorialized in a document titled "Employee Corrective Action," together with a three-day suspension, for the violation. Appellant signed the written disciplinary document, which set forth the prescribed corrective action as follows:

> Follow all PPE and safety requirements at all times. In this case, do
> not wear gloves while operating rotating equipment. * * * Any further
> violation * * * will result in termination of employment.

Appellant did not object to or dispute the factual allegations contained in the corrective action. In subsequent deposition testimony, appellant provided that at the time he signed the corrective action, his understanding was that he was not to "run the milling machine with the Kevlar gloves on anymore."

{¶ 19} Appellant served his three-day suspension, and on May 1, 2017, he returned to work on light duty. Appellant did not want to work in the light-duty position, however, and immediately inquired as to how he could return to the tool and die maker

7.

position. Lakepark advised that he would need a full release from his doctor. Appellant obtained the required release and, on May 8, 2017, returned to Lakepark on full duty as a tool and die maker. Upon his return, appellant was able to adequately perform his job duties. At no time did he request an accommodation for his tool and die maker job.

{¶ 20} On May 8, 2017, the very day of appellant's return to full duty as a tool and die maker, Zagurskie, who was Tool and Die Area Manager, and Jeff Kreinbrink, also a tool and die maker, observed appellant wearing Kevlar gloves while operating the profile grinding machine. At such time, Zagurskie confronted appellant about wearing the Kevlar gloves while operating a piece of rotating equipment. In addition, Zagurskie promptly notified his supervisor, appellee Baldridge, about appellant's conduct. Baldridge and Zagurskie called appellant into a meeting to discuss the incident, and then sent him home, pending an investigation. On May 9, 2017, Curtis notified appellant that he was terminated for violating the Employee Corrective Action.

{¶ 21} At deposition, appellant admitted that operating the profile grinder while wearing Kevlar gloves was a violation of the subject Employee Corrective Action.

## Law and Argument

### Standard of Review

{¶ 22} On review, appellate courts employ the same standard for summary judgment as trial courts. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (1989). The motion may be granted only when it is demonstrated "(1) that there is no genuine issue as to any material fact; (2) that the moving party is

8.

entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978); Civ.R. 56(E).

{¶ 23} We will begin by addressing appellants' first assignment of error, wherein they argue that appellees were not entitled to summary judgment on appellants' workers' compensation retaliation claim. Claims for workers' compensation retaliation are governed by R.C. 4123.90, which pertinently provides:

> No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer.

{¶ 24} Courts analyze a claim for workers' compensation retaliatory-discharge under a burden-shifting framework. *Onderko v. Sierra Lobo, Inc.*, 2014-Ohio-4115, 20 N.E.3d 322, ¶ 15 (6th Dist.). An employee bears the burden of establishing a prima facie case of retaliatory discharge by demonstrating: (1) the employee filed a workers' compensation claim, or instituted, pursued, or testified in a workers' compensation proceeding; (2) the employer discharged, demoted, reassigned, or took punitive action

9.

against the employer; and (3) a causal link exists between the employee's filing or pursuit of a workers' compensation claim and the adverse action by the employer. *Id.* at ¶ 28.

{¶ 25} If the employee succeeds in establishing a prima facie case of workers' compensation retaliation, the burden shifts to the employer to show a legitimate, non-retaliatory reason for the discharge. *Id.* at ¶ 15. If the employer meets this burden, the burden then shifts back to the employee to show that the employer's purported reason is pretextual, and that the actual reason for the employee's discharge was "because the employee engaged in activity that is protected under the Ohio Workers' Compensation Act." *Id.* at ¶ 15. To establish pretext, the employee must demonstrate that the employer's proffered reason for firing the employee: (1) had no basis in fact; (2) did not actually motivate the discharge; or (3) was insufficient to motivate the discharge. *Harris v. OHNH EMP, L.L.C.*, 2015-Ohio-3212, 37 N.E.3d 1256, ¶ 15 (9th Dist.).

{¶ 26} In the case at bar, Lakepark acknowledges that appellant can establish the first two elements of a prima facie case for workers' compensation retaliation. The parties' only dispute here involves the question of whether appellant can establish a causal link between appellant's filing of the workers' compensation claim and Lakepark's discipline or termination of appellant. "The inference of retaliatory motive may be drawn from the surrounding circumstances, including the timing of the discharge relative to the protected conduct, whether punitive action was directed toward the employee as a result of the claim, a hostile attitude[ ] toward the employee once the claim

10.

was filed, disparate treatment of the employee relative to others, and requests not to pursue a claim." (Internal quotations omitted.) *Harris* at ¶ 14.

{¶ 27} Appellant argues that the fact that appellant was terminated within seven days after he returned to work, following his three-day suspension beginning on April 24, 2017, established temporal proximity between Lakepark's knowledge of appellant's protected activity and appellant's termination sufficient to constitute evidence of a causal connection. In *Ningard v. Shin-Etsu Silicones of Am., Inc.*, 9th Dist. Summit No. 24524, 2009-Ohio-3171, the Ninth District Court of Appeals, recognizing that temporal proximity between protected activity and an adverse action may, indeed, be sufficient to establish the causation element of a claim for worker's compensation retaliation, stated the following:

> The U.S. Supreme Court has explained that to determine a "causal connection"
>
> "[t]he court may look to the temporal proximity between the adverse action and the protected activity to determine whether there is a causal connection. See *Harrison v. Metro. Govt. of Nashville & Davidson Cty., Tenn,.* (C.A.6, 1996), 80 F.3d 1107, 1118-1119. However, other evidence is usually required, especially where the events are separated by more than a few days or weeks. *Id.* 'The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima

facie case uniformly hold that the temporal proximity must be very close.'

*Clark Cty. School Dist. v. Breeden* (2001), 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509[ ]. Nevertheless, a prima facie case requires only a minimal showing before shifting the burden to the employer to explain an adverse employment action. *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 [ ]; *Sprenger v. Fed. Home Loan Bank* (C.A.8, 2001), 253 F.3d 1106, 1111.

*Id.* at ¶ 17 (citation omitted.) Thus, although temporal proximity may be sufficient in and of itself to establish the element of causation, such temporal proximity must be "very close." *See id.*

{¶ 28} This court, in *Onderko, supra*, recognized that the "protected activity" that underlies any workers' compensation retaliation claim is the filing or pursuit of the claim. *Onderko*, 2014-Ohio-4115, 20 N.E.3d 322, at ¶ 28-29. Therefore, to satisfy the third element of such a claim, there must be a causal link between the filing or pursuit of a workers' compensation claim and the adverse employment action; stated otherwise, the adverse employment action must be "in direct response to the filing or pursuit of a workers' compensation claim." *Id.* at ¶ 29.

{¶ 29} In the instant case, appellant acknowledges that "Lakepark was aware that [appellant] filed for workers' compensation benefits on or about September 13, 2016," months before appellant's termination. Such does not constitute "very close" proximity between the protected activity and the adverse employment sufficient to establish

12.

causation. Further, appellant was unable to cite, and research by this court was unable to show, any authority to support appellant's position that simply returning to work from workers' compensation disability constitutes protected activity under R.C. 4123.90. Nor is there any authority to support that an employer's "knowledge" of a claim is sufficient to give rise to a retaliatory discharge claim.

{¶ 30} Next, appellant argues, by implication, that Lakepark had a hostile attitude toward appellant, which motivated the termination decision. Specifically, appellant points to certain comments that were made to appellant by Downing upon appellant's return to work, including, "I guess you are left-handed now," and that appellant would have to "jerk off left-handed." According to appellant, these comments "suggest[] that Lakepark realized [that appellant's] hand condition was significant and may have used this information in their decision to terminate [him]. Such isolated comments, however, out of context, and in the absence of other evidence, are insufficient to establish a causal link between termination and the filing of a workers' compensation claim. *See Gerding v. Girl Scouts of Maumee Valley Council, Inc.*, 6th Dist. Lucas No. L-07-1234, 2008-Ohio-4030, ¶ 32.

{¶ 31} Finally, appellant claims that evidence of several factual disputes regarding the underlying termination decision is sufficient to establish that punitive action was directed toward appellant as a result of his workers' compensation claim. First, appellant states that, although he was wearing Kevlar gloves at the time he was stopped by Zagurskie, he was simply wearing the gloves to move warm block from one area to the

13.

profiler, and that he was not yet utilizing the machine. He further argues that, prior to September 13, 2016, other "non-disabled" tool and die makers wore Kevlar gloves while operating the profiler and were not disciplined or terminated and, thus, he was treated differently. Lastly, appellant argues that the Lakepark disciplinary policy was not precisely followed, inasmuch as he should not have been issued a final warning in response to his September 13, 2016 injury, and, further, that the corrective action was "wrong" in stating that "no gloves were to be worn on any rotating equipment," when certain tight-fitting gloves were, in fact, allowed.

{¶ 32} In the opinion of this court, none of this evidence, taken separately or in combination, is sufficient to establish the causation element of appellant's workers' compensation retaliation claim. Regarding evidence of the May 8, 2017 incident, appellant himself concedes that at the time he was discovered wearing the Kevlar gloves, he had set his two blocks onto the profile machine and had "turn[ed] the spindle on it," because he was "getting ready to grind a weld off." He denies, however, that he had actually begun to use the machine, as was described by appellees. In the opinion of this court, such an insignificant factual discrepancy between appellant's account and the one that was set forth by appellees is not in itself sufficient to establish that appellant was terminated as a result of his workers' compensation claim.

{¶ 33} In addition, any evidence that prior to September 13, 2016—the date of appellant's injury—other tool and die makers were neither disciplined nor terminated for wearing Kevlar gloves while operating rotating equipment is likewise insufficient to

establish causation. Prior to September 13, 2016, appellant himself was never punished for wearing Kevlar gloves while operating rotating equipment. Instead, appellant received the corrective action only after he was injured. Even then, he was allowed to return, but with the understanding that he would not be allowed, in the future, to wear Kevlar gloves while operating rotating equipment. To the extent that appellant argues that the corrective action was "wrong" in stating that "no gloves were to be worn on any rotating equipment," when certain tight-fitting gloves were, in fact, allowed, it is undisputed that wearing Kevlar gloves on rotating equipment was specifically and unequivocally prohibited.

{¶ 34} Finally, we consider appellant's argument that the Lakepark disciplinary policy was not precisely followed, in that he should not have been issued a "final warning" in response to his September 13, 2016 injury. This argument is of no avail, however, because appellant himself acknowledges that, assuming his conduct was properly deemed "gross misconduct," insofar as it could be construed as seriously threatening the safety and welfare of any team member or other person, Lakepark would have acted in complete conformity with its policy if it had terminated appellant from the start, rather than taking, as it did, the less drastic action of issuing appellant a final warning.

{¶ 35} On the basis of all of the foregoing, we find that appellant has failed to produce any evidence establishing that Lakepark disciplined or terminated him because he filed the workers' compensation claim.

15.

{¶ 36} Even assuming, arguendo, that appellant had succeeded in establishing a prima facie case for unlawful retaliation, Lakepark has set forth a legitimate, nonretaliatory reason for the discharge. Lakepark has provided ample evidence that it terminated appellant because he violated the terms of the Employee Corrective Action. Worth repeating is that appellant did not contest his suspension upon his return to work from disability, and, in fact, admitted that he violated Lakepark policy, ultimately signing the Employee Corrective Action form without compulsion. Appellant also admitted that violating such safety protocol could lead to termination. Finally, appellant admitted that operating the profiler machine while wearing Kevlar gloves was a violation of the Employee Corrective Action.

{¶ 37} Appellant's contention that he was not actually utilizing the profiler in contravention of the Employee Corrective Action at the time he was stopped by Zagurskie does nothing to help appellant establish pretext in this case. The evidence is clear that Lakepark had a reasonable basis to infer that appellant was operating the profiler while wearing gloves in contravention of the Employee Corrective Action, based on the eyewitness observations of Zagurskie and Kreinbrink. Accordingly, it is the determination of this court that appellant has failed to establish that Lakepark's proffered reason for firing appellant: (1) had no basis in fact; (2) did not actually motivate the discharge; or (3) was insufficient to motivate the discharge. *See Harris*, 2015-Ohio-3212, 37 N.E.3d 1256, at ¶ 15.

16.

{¶ 38} For all of the foregoing reasons, appellants' first assignment of error is found not well-taken.

{¶ 39} Next, we will address appellants' second assignment of error, wherein they argue that appellees were not entitled to summary judgment on appellant's disability discrimination claim. R.C. 4112.02(A) prohibits "any employer, because of the * * * disability * * * of any person, to discharge without just cause * * * that person * * *." A disability is defined as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." R.C. 4112.01(A)(13).

{¶ 40} To establish a prima facie case of disability discrimination, an employee must prove: (1) he was disabled; (2) he suffered an adverse employment action based, at least in part, on that disability; and (3) he could safely and substantially perform the essential functions of the job. *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 571, 697 N.E.2d 204 (1998).

{¶ 41} If the employee demonstrates a prima facie case of discrimination, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action. *Ray v. Ohio Dept. of Health*, 2018-Ohio-2163, 114 N.E.3d 297, ¶ 25 (10th Dist.). If the employer does this, then the burden again shifts to the employee to show that the proffered reason was not the true reason for the

17.

adverse employment action. *Id.* In general, "courts have found that a plaintiff establishes pretext by proving one or more of the following: (1) that the employer's proffered reasons for the adverse employment action had no basis in fact, (2) that the proffered reasons were not the true reason(s), or (3) that the proffered reason(s) were insufficient to motivate discharge." *Nelson v. Univ. of Cincinnati*, 2017-Ohio-514, 75 N.E.3d 1304, ¶ 35 (10th Dist.).

{¶ 42} At the outset, appellees argue that appellant was not disabled at the time of his discharge. As indicated above, to be disabled under R.C. 4112.02, appellant must show that his right middle finger amputation "substantially limit[ed]" at least one major life activity at the time of his termination. R.C. 4112 does not define the term "substantially limits," but because Ohio's disability discrimination statute is similar to the federal Americans with Disabilities Act ("ADA"), we can look to federal cases for guidance in interpreting the Ohio statute. *Carnahan v. Morton Bldgs. Inc.*, 2015-Ohio-3528, 41 N.E.3d 239, ¶ 7 (3d Dist.). Current law on this issue is set forth by the court in *Miller v. Maryland Dept. of Nat. Resources*, 813 Fed.Appx. 869, 875 (4th Cir.2020), as follows:

> For a major life activity to be "substantially limit[ed]," the impairment need only "substantially limit[ ] the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered

substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). Importantly, this standard is much more lenient than the previous ADA standard. Prior to the enactment of the ADAAA in 2009, the regulations and case law held, "'[s]ubstantially' in the phrase substantially limits' suggests 'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (quoting Webster's Third New International Dictionary 2280 (1970) (defining 'substantially'). Courts also considered factors such as "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Id*. at 196, 122 S.Ct. 681 (alterations and quotation marks omitted). * * *

There is no requirement that an actual disability be long lasting or severe. *See* 29 C.F.R. § 1630.2(j)(1)(ix). Determining whether the activity is substantially limited compared to most people "usually will not require scientific, medical, or statistical analysis." *Id.* at § 1630.2(j)(1)(v).

{¶ 43} In the instant case, appellant contends that at the time of his termination, he still had "significant grasp difficulties," and "difficulty handwriting, performing household chores, opening doors, and buttoning his shirt." These difficulties correspond to major life activities such as caring for one's self, performing manual tasks, and working. *See* R.C. 4112.01(A)(13). As far as appellant's work is concerned, appellant

testified, "I believe I could do anything. I'm trying to do everything. It's just a matter of maybe having to do things in a different procedure or a different way or have some assistance lifting a heavier block or whatever. But as far as being able to do my job, I could pretty much do it." Even under the current, more lenient interpretation standard, we find that appellant has failed to meet his burden of showing that he is disabled, as there is no evidence to suggest whether appellant's impairments, as described, substantially limit his ability to perform the aforementioned (or any other) major life tasks as compared to most people in the general population. *See Miller* at 875. Accordingly, we find that appellant has failed to establish the first prong of his disability discrimination claim.

{¶ 44} Appellant argues that, even if he is not disabled, Lakepark perceived him as disabled. As indicated above, it is a violation of R.C. 4112.02 for an employer to discriminate against an employee on the basis of a perceived physical or mental impairment. *Columbus*, 82 Ohio St.3d at 571, 697 N.E.2d 204.

{¶ 45} A plaintiff meets the requirements of "being regarded as" having a physical or mental impairment if the "individual establishes that she has been subjected to an action prohibited under [R.C. Chapter 4112 or 42 U.S.C. 12102] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Field v. MedLab Ohio, Inc.*, 8th Dist. Cuyahoga No. 97990, 2012-Ohio-5068, ¶ 10, citing 42 U.S.C. 12102(A)(3). Further, "[a]n individual may fall into the definition of one regarded as having a disability if an

20.

employer ascribes to that individual an inability to perform the functions of a job because of a medical condition, when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell's Soup Co.*, 237 F.3d 701, 706 (6th Cir.2001).

{¶ 46} In the instant case, appellant argues that Lakepark's mere awareness of the condition of his right hand is enough to demonstrate that Lakepark perceived him as disabled. However, appellant cites no case law to support this proposition. To the contrary, courts have held that mere awareness of a condition, even with work restrictions, does not establish that an employer regarded an employee as disabled. *See Green v. Rosemont, Inc.*, 5 F.Supp.2d 568, 573 (S.D.Ohio 1998); *Harrigan v. Dana Corp.*, 612 F.Supp.2d 929, 947 (N.D.Ohio 2009). Moreover, Lakepark had no reason to perceive appellant as disabled, since appellant himself lobbied to return to, and succeeded in securing, his former position of employment.

{¶ 47} Appellant cites as additional evidence to show that Lakepark perceived appellant as being disabled Downing's previously-mentioned offensive comments about appellant being "left-handed now," and having to "jerk off left-handed." These types of simple teasing comments and isolated incidents, however, do not rise to the level of conduct necessary to support a cause of action for discrimination. See *Silvers v. Clay Twp. Police Dept.*, 2018-Ohio-2970, 117 N.E.3d 954, ¶ 40 (2d Dist.).

{¶ 48} For all of the foregoing reasons, we find that appellant has failed to establish the first prong of a prima facie case for disability discrimination. *Columbus*, 82 Ohio St.3d at 571, 697 N.E.2d 204.

21.

{¶ 49} Even, assuming arguendo, that appellant had established that he is disabled, he is unable to establish the second prong of the prima facie case, which requires that he show that he suffered an adverse employment action based, at least in part, on that disability. *Columbus* at 571. Appellant produced no evidence that either Lakepark's awareness of the injury to appellant's hand or the comments made by Downing had any connection to the termination decision.

{¶ 50} Instead, the evidence shows that Plant Manager Wireman made the decision to terminate appellant because appellant failed to comply with the Employee Corrective Action. Appellant, in an attempt to show that this legitimate, non-discriminatory reason for his termination was pretextual, raises the identical factual arguments that he raised in connection with his claim for workers' compensation retaliation, including claims that he was not, in fact, utilizing the profiler machine when he was stopped by Zagurskie; that, in being disciplined, he was treated differently from other tool and die makers; that the disciplinary policy was not precisely followed; and that the directive not to wear gloves was "wrong." We incorporate by reference herein our previous discussion of these arguments, including our related conclusions dismissing those arguments as meritless.

{¶ 51} For all of the foregoing reasons, we find that appellants' second assignment of error is found not well-taken.

{¶ 52} We turn, now, to appellants' third assignment of error, wherein they assert that appellees were not entitled to summary judgment on appellant's public policy

wrongful termination claim. Generally, an employer may terminate an at-will employee for any reason which is not contrary to law. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). An exception to the employment-at-will doctrine exists where the employee's discharge violates public policy. *Painter v. Graley*, 70 Ohio St.3d 377, 639 N.E.2d 51 (1994), syllabus. To establish a prima facie claim of wrongful discharge in violation of public policy, the employee must demonstrate the following four elements: (1) a clear public policy existed and was manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (the clarity element); (2) dismissing an employee under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked an overriding legitimate business justification for the dismissal (the overriding justification element). *Collins v. Rizkana*, 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653 (1995). To avoid summary judgment, an employee must establish a genuine issue of material fact as to each of the four elements. *Whitaker v. First Energy Nuclear Operating Co.*, 6th Dist. Ottawa No. OT-12-021, 2013-Ohio-3856, ¶ 17. Under the clarity element analysis, an employee cannot simply allege that clear public policy exists because of a general societal interest, but rather must set forth a specific law. *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825.

{¶ 53} Appellants' complaint alleges that there is a clear public policy enunciated in "R.C. 4101.11 and R.C. 4101.12, and/or administrative regulations, including OSHA

23.

or in the common law, against terminating an employee based on his complaints of unsafe working conditions, unsafe tools, and/or an unsafe working environment." The court in *Dohme* held that generalizations about "workplace safety" that are contained in the OSHA laws and regulations are not specific enough to maintain a public policy claim; rather, "to satisfy the clarity element of a claim of wrongful discharge in violation of public policy, a terminated employee must articulate clear public policy by citation of specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations or common law. *Id*. at 173-174. This court, in *Whitaker*, held that an employee's reliance on R.C. 4101.11 and 4101.12, which are general and broad statutes requiring employers to provide a safe workplace, was insufficient to satisfy the clarity element as established by *Dohme*. *Whitaker*, supra, at ¶ 25.

{¶ 54} In his brief, appellant, relies on *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 152, 677 N.E.2d 308 (1997), for the proposition that he satisfied the clarity element because he *participated* in an OSHA investigation. We find that this reliance is misplaced, however. In *Kulch*, the Ohio Supreme Court found, on the basis Section 660(c), Title 29, U.S.Code, that it is the *filing* of an OSHA claim satisfies the clarity element. *Id*. at 151-152.

{¶ 55} In his reply brief, appellant attempts to persuade us that a review of the entirety of Section 660(c), Title 29, U.S.Code, supports his position that the holding in

24.

*Kulch* should be extended to apply to employees who merely participate in OSHA investigations. Section 660(c), Title 29, U.S.Code, in its entirety, provides as follows:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

Appellant argues that because Section 660(c), Title 29, U.S.Code, protects not only employees who *file* complaints with OSHA, but also employees who *testify* in OSHA proceedings, he should be likewise protected for "speaking with an OSHA investigator." We find, however, that such an attenuated application of Section 660(c), Title 29, U.S.Code, contravenes the specificity requirement that the law imposes and, therefore, is insufficient to support the element of clarity in this case.

{¶ 56} In rendering this decision, we are mindful that it was, in fact, Lakepark that contacted OSHA to report appellant's accident. The OSHA investigator contacted appellant only after interviewing Lakepark about the accident and only after Lakepark provided appellant's contact information. Testimony by appellant establishes that he did not even know the reason that an OSHA investigation was commenced.

{¶ 57} Accordingly, appellants' third assignment of error is found not well-taken.

{¶ 58} Next, we will address appellants' fourth assignment of error, asserting that appellees were not entitled to summary judgment on appellant's intentional tort claim. Ohio's employer intentional tort statute, codified at R.C. 2745.01, relevantly provides as follows:

(A) In an action brought against an employer by an employee, * * * for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.

(B) As used in this section, 'substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death.

(C) Deliberate removal by an employer of an equipment safety guard * * * creates a rebuttable presumption that the removal or misrepresentation was committed with intent to injure another if an injury * * * occurs as a direct result.

*Id.*

{¶ 59} The Supreme Court of Ohio, in *Hewitt v. L.E. Myers Co.*, 134 Ohio St.3d 199, 2012-Ohio-5317, 981 N.E.2d 795, held that "as used in R.C. 2745.01(C), 'equipment safety guard' means a device designed to shield the operator from exposure

to or injury by a dangerous aspect of the equipment, and the 'deliberate removal' of an equipment safety guard occurs when an employer makes a deliberate decision to lift, push aside, take off, or otherwise eliminate that guard." *Id.* at ¶ 26, 30.

{¶ 60} Appellant bases his employer intentional tort claim on allegations that: (1) Lakepark failed to repair an E-Stop (emergency stop) button on the Bridgeport machine; (2) Lakepark failed to repair the programmable aspect of the Z-Axis on the Bridgeport machine; and (3) failed to install a point of operation guard on the Bridgeport machine.

{¶ 61} We first consider appellant's claims arising from Lakepark's alleged failure to repair the E-Stop button and the programmable aspect of the Z-Axis. Our review of the record reveals that the E-Stop button is designed to stop the operation of the milling machine, and that the programmable Z-Axis permits automated operation of the milling machine. In deciding whether these devices fit the definition of "equipment safety guards," as set forth in the statute, we look to this court's decision in *Fickle v. Conversion Technologies Internatl., Inc.*, 6th Dist. Williams No. WM-10-016, 2011-Ohio-2960.

{¶ 62} In *Fickle*, the employee's hand and arm were caught in the pinch point of a roller on an adhesive-coating machine. As part of her claim, the employee alleged that her employer had failed to train her to use a jog switch that would stop the roller and, also, had disconnected the emergency stop cable. In finding against the employee, this court concluded that the jog switch and the emergency stop cable were not "equipment safety guards," because they did not prevent the employee's hands from being exposed to

27.

the dangerous point of operation of the machinery that she had been operating. *Id.* at ¶ 44. Nothing in the record suggests that either the E-Stop or Z-Axis are devices designed to protect the point of operation on the Bridgeport milling machine. Therefore, pursuant to our holding in *Fickle*, we find that such devices are not equipment safety guards as a matter of law.

{¶ 63} Next, we consider that portion of appellant's claim that arises from Lakepark's alleged failure to install a point of operation guard on the Bridgeport machine. Here, there is no question that we are dealing with an equipment safety guard. At issue is the question of whether the alleged failure to install amounts to "deliberate removal," under R.C. 2745.01(C). As indicated above, the court in *Hewitt* determined that the "deliberate removal" of an equipment safety guard occurs when an employer makes a deliberate decision to lift, push aside, take off, or otherwise eliminate that guard. *Hewitt* at ¶ 26, 30. The court of appeals in *Thompson v. Oberlander's Tree & Landscape Ltd.*, 2016-Ohio-1147, 62 N.E.3d 630 (3d Dist.) extended this definition to encompass situations where an employer "makes a deliberate decision *not to either repair or replace an equipment safety guard that is provided by the manufacturer and/or required by law or regulation to be on the equipment.*" *Id*. at ¶ 34. Broadening the definition of "deliberate removal" even further, the court of appeals in *Wineberry v. N. Star Painting Co.*, 2012-Ohio-4212, 978 N.E.2d 221 (7th Dist.), concluded that the term "not only encompasses removing safety equipment, but also the *failure to attach* safety equipment *provided by the manufacturer. Id*. at ¶ 38.

28.

{¶ 64} In the instant case, appellant makes no claim that Lakepark failed to attach safety equipment provided by the manufacturer. This is presumably because there is no evidence in the record that the manufacturer ever provided safety equipment for the Bridgeport machine, either upon delivery of the machine or at any time thereafter. Instead, appellant claims only that the manufacturer "placed a label requesting that Lakepark place point of operation guards on the [Bridgeport machine]." In order for appellant's claim to survive summary judgment, we would have to broaden the definition of "deliberate removal" even further than the court in *Wineberry* did, to include "the failure to attach safety equipment, whether or not supplied by the manufacturer." This we decline to do.

{¶ 65} Accordingly, appellants' fourth assignment of error is found not well-taken.

{¶ 66} Finally, we consider appellants' fifth assignment of error, stating that appellees were not entitled to summary judgment on appellant Tracey Creveling's loss of consortium claim. In appellants' brief, they concede that Tracey Creveling's loss of consortium fails as a matter of law if appellant's claims fail. Because we have determined that appellant's claims do fail in their entirety, Tracey Creveling's claim must likewise fail.

{¶ 67} Accordingly, appellants' fifth assignment of error is found not well-taken. The judgment of the Huron County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

29.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.        

                                 
_____
JUDGE

Christine E. Mayle, J.      

_____

Myron C. Duhart, J.                                 JUDGE
CONCUR.

_____
JUDGE


This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.