[Cite as *Anderson v. AccuScripts Pharmacy, L.L.C.*, 2022-Ohio-1663.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

NIKKIE ANDERSON,                          :

    Plaintiff-Appellant,          :

                            No. 110261

    v.                            :

ACCUSCRIPTS PHARMACY, L.L.C.,    :

    Defendant-Appellee.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** May 19, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-913874

---

### *Appearances:*

The Spitz Law Firm, LLC, and Fred M. Bean, *for appellant*.

Bugbee & Conkle, LLP, Mark S. Barnes, and Carl Habekost, *for appellee*.

---

LISA B. FORBES, J.:

{¶ 1} Plaintiff-appellant Nikkie Anderson ("Anderson") appeals the trial court's decision to grant summary judgment in favor of her former employer, defendant-appellee AccuScripts Pharmacy, L.L.C. ("AccuScripts"), and deny her motion for partial summary judgment. After reviewing the facts of the case and

pertinent law, we reverse the lower court's judgment and remand this case to the trial court for proceedings consistent with this opinion.

## I. Facts and Procedural History

{¶ 2} On May 1, 2018, Anderson was hired at AccuScripts as a "toter." Her responsibilities included preparing the packaging of prescriptions to be delivered to long-term care facilities. According to Anderson, she informed AccuScripts that she had epilepsy during her job interview. Anderson testified that she shared with her interviewers a list of the medications she took to manage her condition.

{¶ 3} Anderson's first day of work was May 8, 2018. She was terminated later that month following an extra shift she agreed to work on May 19, 2018. According to Anderson, during that shift she asked her immediate supervisor if she could bring her service dog to work with her, and she experienced symptoms indicating an oncoming epileptic seizure. Anderson testified that her supervisor instructed her to go home because she was not feeling well.

{¶ 4} Anderson's supervisor, Rebecca Bauman ("Bauman"), disputed that she approved Anderson leaving the workplace during her shift. AccuScripts maintained that Anderson was terminated for failing to successfully complete her probationary period.

{¶ 5} In April 2019, Anderson filed a complaint alleging that AccuScripts terminated her based on her disability in violation of R.C. 4112.02. AccuScripts moved for summary judgment. Anderson filed a brief in opposition and a cross-

motion for partial summary judgment, arguing that her medical condition, epilepsy, is a disability as a matter of law.

{¶ 6} On January 4, 2021, the court found that Anderson failed to show that she is disabled under R.C. 4112.02(A) — specifically, that she had not established that her epilepsy "substantially limited her major life activities." The court denied Anderson's motion for partial summary judgment and granted AccuScripts' motion for summary judgment.

{¶ 7} Specifically, the trial court held:

> Plaintiff submitted an affidavit stating that she has a diagnoses of epilepsy. However, Plaintiff failed to submit evidence through an expert, or otherwise, as to whether her epilepsy substantially limited her major life activities, such as caring for herself, performing manual tasks, or whether her condition substantially limits her ability to work. As to Plaintiff's cross-motion for partial summary judgment, in viewing the facts and construing the evidence in the light most favorable to the defendant as the non-moving party, the court finds that although there is evidence to support that [Plaintiff] has epilepsy, Plaintiff has failed to provide evidence that her condition substantially limits one or more major life activities pursuant to R.C. 4112.02(a). Plaintiff has failed to demonstrate that she is disabled under the law.
>
> * * *
>
> In viewing the facts and construing the evidence in the light most favorable to the plaintiff as the non-moving party, the court finds that there are no genuine issues of material fact and that reasonable minds could only come to one conclusion: Defendant AccuScripts Pharmacy LLC is entitled to judgment as a matter of law under Civ.R. 56(C) * * *.

{¶ 8} It is from this order that Anderson appeals, raising two assignments of error:

> I. The trial court committed reversible error by determining, as a matter of law, that Anderson is not disabled despite suffering from epilepsy.

II. The trial court committed reversible error by determining that no genuine issue of material fact remained as to Anderson's disability discrimination claims under R.C. 4112.02.

## II. Civ.R. 56(C) Evidence

{¶ 9} To support its summary judgment motion, AccuScripts attached Anderson's medical records from January 2018 - April 2020, and the affidavit of her treating neurologist Dr. Mark Bej, and cited to deposition testimony provided by Anderson, Bauman, AccuScripts employee Mercedes Stewart ("Stewart"), and Craig Baughman ("Baughman"), AccuScripts' vice president of pharmacy operations. To support her position, Anderson attached her affidavit to her brief in opposition of summary judgment/partial motion for summary judgment and cited to her own deposition testimony, as well as the deposition testimony of Bauman, Stewart, and Baughman.

### A. Anderson's Deposition and Affidavit Testimony

{¶ 10} Anderson testified that she was first diagnosed with epilepsy at age eight and her last serious seizure was in 2017, after which she was placed on new medication to better control her condition. According to her medical records, Anderson's last seizure occurred "possibly early 2017," more than a year before her employment with AccuScripts.

{¶ 11} Anderson testified that she has experienced three types of seizures: absence, tonic-clonic, and grand mal.

{¶ 12} According to Anderson, absence seizures are where you "space out" for a brief period of 15-30 seconds. "You can learn how to pick up a conversation

where you personally left off. You may not remember everything that the other person said."

{¶ 13} Tonic-clonic seizures can result in Anderson's inability to move or speak for 5-15 minutes, depending on the seriousness of the seizure. Anderson testified that prior to having a tonic-clonic seizure she experiences "auras," during which her senses are heightened. "You feel like you're in a bubble and nobody can really come into the bubble, or you can't escape it. It's just engulfing you." When Anderson experiences an aura, she takes medication to either prevent a potential seizure from occurring or reduce the seriousness of a seizure.

{¶ 14} As to the third type of seizure, grand mal, Anderson testified that she "didn't know [they] were coming. They were completely unexpected." Anderson has suffered two to three grand mal seizures during her lifetime but had not had one for a few to several years prior to her employment with AccuScripts. According to Anderson, she had a grand mal seizure when she was 12 years old. "I turned blue. I was totally tensing, foaming at the mouth, urinating. I don't remember any of that. It just happens." She had another grand mal seizure when she was in her twenties. "I was just having a conversation with a girl at a nightclub, then next thing I knew, I was in the hospital. I guess I broke my face open on a chair."

{¶ 15} Anderson reports to her neurologist when she has seizures. After her last seizure, her doctor changed her medication and she now takes three medications to manage her epilepsy: Levetiracetam, Zonisamide, and Clonazepam. She has not had a seizure since her change in medication. Anderson maintained

that she provided a list of these medications to AccuScripts during her interview for the position as a toter.

{¶ 16} Anderson was asked during her deposition how her epilepsy affected her day-to-day activities. She responded:

> I have to watch what I eat. I have to watch how much I sleep. I have to make sure I'm not watching something with flashing lights on the TV or drive if I'm tired. If I do have an aura, I can't be around anything that has like a sharp edge. Since I got my dog, it's been a lot easier to where those little micromanaging things in life I don't have to constantly think about, because he's doing it for me.

{¶ 17} Asked how experiencing a seizure affects her daily life, Anderson answered that she stops breathing, she cannot move, she "can only communicate [by] blinking [her] eyes," and she feels "just stuck" for between "five minutes to 15 minutes." Anderson stated in her affidavit that her "body will literally shut down where it then must reboot over a period of about 20-30 minutes," affecting her "motor functions and communication skills * * *."

{¶ 18} Asked if having epilepsy interfered with her working, Anderson answered as follows: "If I have a break through seizure, I'm not going to go back to work right away. I'm going to make sure they are managed. Plus you can't drive for six months." Anderson testified that a "break through seizure" is a "seizure that happens spontaneously." Anderson further testified that if she did not take her medication, she "would die."

{¶ 19} Turning to the events of May 19, 2018, Anderson testified that, before her lunch break, she told Bauman she was not feeling well due to her epilepsy.

Anderson told Bauman that she experiences auras "around [her] menstrual cycle. It's common for epileptics. * * * I explained to her your seizure threshold, it opens during that time."

{¶ 20} Anderson testified that she tried to "stick it out" and continued working. She had a second conversation with Bauman a short time later.

> I brought up maybe as a possibility bringing my service dog just one week out of the month, because I was still in the * * * six to eight month seizure free range, which is still really scary. I just wanted everything to go smoothly, brought that up. She said [Baughman] wouldn't go for it. If you're not feeling good, go home. I did tell her I was going to take medication to subside it. She said it's not busy, go home. Go home.

{¶ 21} Anderson claimed that she "never asked to leave." She also told Bauman that her service dog "indicates when I'm about to have a seizure."

> Part of me was uncomfortable being there because I was going up and down the stairs, which are really steep. I know the only thing that lets me know that I'm going to be okay doing something dangerous is my dog. Was I comfortable being there? Not 100 percent, but I also wanted to prove to them that I wanted to keep this job, that is why I'm working on this day that I'm not scheduled to work, that is why I'm not going to ask to go home.

{¶ 22} Anderson recalled that she took her medication "right at lunch time." Asked if she was told to sit in the break room, Anderson answered, "No." Asked if she left immediately after Bauman told her to go home, Anderson testified as follows:

> No, not right after. I kind of wanted to self-prove that I could stay here. I had requested to pick up a shift, to show them that I wanted to be there. I felt what I was doing was important. So, I really wanted to stick it out. When it got to the point of like me being so uncomfortable with how much the aura had heightened, then I was like all right, I'll go.

{¶ 23} Anderson testified that she sat in her car "for a while" and drove home "after the medication kicked in." Asked how long she sat in her car, Anderson said that she did not know because "time either stands still or you just really lose track of it" during an aura.

> I know I wanted to get off the premises because I was about to have an emotional breakdown. There was like a storage parking lot right up the street, so I got in my car, went to the storage parking lot, sat there and just cried, and felt my medication kick in. I cried. I felt like I failed, you know. Then when I felt fine to drive home, I did.

> * * * [Bauman] made me feel unwanted and uncomfortable. She was kind of really pushy. It was just a very uncomfortable interaction. Her tone was very like condescending. Just something about it really felt awful.

{¶ 24} Anderson testified that she went to work for her next shift at AccuScripts on May 21, 2018, and learned that she was fired. "It just went from me asking for an accommodation for my dog, to being fired. There is literally no other reason." According to Anderson, the following occurred when she went to work on May 21, 2018:

> I walked in, walked upstairs to go clock in. I don't remember who came up running after me. Someone said you didn't know. Know what? Come downstairs. Just like a big blur.

> * * *

> I was supposed to speak with [Baughman], plus I wanted to talk to him anyways about bringing my dog. He shut his office door. [Stewart] and someone else brought me in a room. Asked if I got an e-mail. I said no. I woke up and got ready to come here, what is going on.

> * * *

> I was so upset and confused, I seriously cannot even — the conversation I don't remember. I just remember leaving.

\* \* \*

I remember them telling me — she asked if I had gotten an e-mail. I said no. She said they terminated you or something like that. I asked why. She said I don't know. I mean it was just a ball of confusion. Everyone was confused. It was just weird. I remember — I wasn't mad at her obviously. I went home and looked through the handbook and said, hi, love, like I was not mad at her, knew it had nothing to do with her.

**B. Bauman's Deposition Testimony**

{¶ 25} Bauman testified that she is a dispensing supervisor with AccuScripts, and was Anderson's supervisor from May 8, 2018, when Anderson worked her first shift, to May 19, 2018, when Anderson was terminated. Bauman is in charge of scheduling shifts for the toters, including Anderson, at AccuScripts.

{¶ 26} Bauman testified that Anderson missed work on May 15, 2018, and picked up an extra shift on May 19, 2018. Bauman further testified that on May 16, 2018, Anderson was late arriving to work. Anderson was scheduled to work from 1:00 p.m. to 9:00 p.m., but she did not arrive at AccuScripts until 3:00 p.m. Bauman could not recall why Anderson did not work from 1:00 p.m. to 3:00 p.m., but the schedule reflected that Anderson gave some type of notice.

{¶ 27} According to Bauman, prior to May 19, 2018, Anderson did not mention anything about epilepsy, seizures, medication, a disability, or an accommodation. Anderson was scheduled to work from 9:00 a.m. to 6:00 p.m. on May 19, 2018. During her shift, Anderson told Bauman that she "was on her period, she said she took too many of her meds, and she wasn't feeling well." Bauman testified as follows about what happened next:

And then I think then after that I said, "Well, maybe why don't you go into the break room and sit down for a while and see." And then she asked, "Do you think I would be able to bring my service dog to work?" I said, "I don't have the authority to make that decision. I'd have to refer that to [Baughman]; he's the director of pharmacy." And I said, "I'm sure he may have to check with the State Board of Pharmacy to see if there's any kind of regulation with animals in the pharmacy."

{¶ 28} Bauman did not express any opinion to Anderson as to whether Baughman would or would not agree to Anderson bringing her service dog to work. Bauman further testified that Anderson did not explain why she was requesting to bring her service dog to work.

{¶ 29} After Bauman told Anderson to sit in the break room, Anderson responded, "Okay" and left the dispensing area. Approximately 15 minutes later, Bauman checked the break room and the restroom. Anderson "was nowhere to be seen." Bauman asked other AccuScripts employees if they had seen Anderson. Everybody replied that they had not. Bauman testified that Anderson left AccuScripts that day between 1:00 p.m. and 2:00 p.m. Bauman did not see Anderson again that day.

{¶ 30} Asked if, at any time, she told Anderson that Anderson should or could leave for the day, Bauman answered, "No." Bauman further testified that she did not attempt to contact Anderson or tell anyone at AccuScripts that Anderson left. Bauman worked the next day, May 20, 2018, which was a Sunday. Anderson was not scheduled to work that day. Bauman did not have conversations with anyone at AccuScripts that day about Anderson and what happened the previous day.

{¶ 31} Bauman went to work on Monday, May 21, 2018, and spoke with Baughman about Anderson. Bauman testified that Baughman "came into the dispensing room, you know, 'good morning,' pleasantries and then he asked how [Anderson] * * * was doing, and I said she said she didn't feel well on Saturday. I said, you know, I told her to go sit down and when I checked on her she was gone." Bauman testified that she did not tell Baughman about Anderson's request involving her service dog because Bauman "thought it was a nonissue." According to Bauman, Baughman said, "Okay, that's it. I've had enough. She's going to be terminated." The conversation ended, and Bauman went back to work.

**C. Stewart's Deposition Testimony**

{¶ 32} Stewart testified that she works for AccuScripts as a pharmacy technician, administrative assistant to Baughman, and human resources generalist. As Baughman's assistant, she is involved in employee discipline to the extent that she types up what he tells her to type up.

{¶ 33} Stewart testified that she is familiar with AccuScripts' employee handbook. Additionally, her role in the "employee hiring" process at AccuScripts is as follows: "I go over the benefits. I go over the introductory period. I make sure they sign the last page of the code of ethics. Then I take this, what they signed, all the benefit stuff, policies, then I set them up for drug testing, for the background checks."

{¶ 34} Stewart was present for the latter part of Anderson's job interview with Baughman. Stewart testified that, while she was part of Anderson's interview,

Anderson did not say anything about being epileptic, having seizures, or a service dog. Anderson produced a list of medications, which was handed to Baughman, and said, "[T]hese are the medications that I take. Do you know if I would fail the drug test." Baughman asked Anderson if she was able to drive, and Anderson replied that she was. According to Stewart, Baughman "asks everyone are you able to drive."

{¶ 35} According to Stewart, she told Anderson, "[T]his is the probationary * * * period of 90 days, at-will employee. If at any time you feel you are not a fit, you can leave on your own recognizance, we can dismiss you." Stewart testified that she gave Anderson an AccuScripts employee handbook when she was hired. On May 1, 2018, Anderson signed an acknowledgement that she received the handbook.

{¶ 36} Stewart testified that AccuScripts' employee handbook references "an introductory period" and "PTO accruals"[1] that are available "following completion of 90 days of employment." Other than these two references, AccuScripts' employee handbook does not mention a "probationary period." Stewart also testified that there is a "progressive discipline for unexcused absence" policy in the AccuScripts handbook "that includes verbal warning, written warning, and subject to termination." However, Stewart testified that she has "never done a written warning for anyone. It's always been a verbal, seeing the supervisor. Say, hey, watch your attendance. Never a written warning. It's always been verbal coaching. Then after that, subject to termination."

---

[1] It is unclear from the record what "PTO accruals" are.

{¶ 37} Stewart testified that she was aware that Anderson missed work on May 15, 2018, because Anderson was under medical care for a spider bite. Stewart received Anderson's "return to work" letter for May 16, 2018.

{¶ 38} Stewart testified that on Anderson's first or second day of work, Baughman told her that Anderson was "wandering from her area" talking to other employees. She also testified that on May 18, 2018, Baughman complained to her that Anderson was carrying her purse into the tote room, which is against AccuScripts' policy, and she was sitting on the floor during her shift. Stewart does not know if Anderson was given a verbal warning about these issues.

{¶ 39} Stewart testified as follows about what occurred at AccuScripts on May 21, 2018: "I don't remember the exact time but [Baughman] comes to my desk. He said, I need you to get a hold of Nikkie Anderson. He said that she had repetitively called off work. I've talked to her about her attendance, about carrying a purse, about sitting on my floor. He said, I just need to let her know she is being terminated." Stewart called Anderson, left a message on her cell phone, and emailed her. The email that Stewart sent to Anderson states in part as follows:

> This letter is to inform you that you are terminated from your probationary employment with AccuScripts Pharmacy effective today, May 21, 2018. The reason for your termination is your failure to successfully complete your probationary period, as outlined in AccuScripts Pharmacy Handbook.

{¶ 40} Anderson showed up to work that day, and Stewart informed her that "she was being terminated in regards to her attendance, her work ethic, work output

didn't match what she was being asked to do. She said, okay, I understand. She said, well, can I use you as a reference. I said yes."

{¶ 41} Later that afternoon, Anderson replied to Stewart's email as follows:

> Hi love. I just went over the employee handbook and believe I was wrong fully terminated. I wasn't scheduled to work Saturday. I requested to pick it up. Also I gave sufficient notice as to how I was feeling prior to going to lunch. She said because I wasn't scheduled I could leave if by the time I came back I wasn't feeling any better. Mercedes the only day my supervisor ever smiled at me was today when she told me to go talk to Craig. She also never told anyone in my dept of my 4-9 shift on thurs of which I came in at 3. As soon as I was done at my neuro I came to work. When did it become my job to inform everyone there that I had an appt other than my immediate supervisor?
>
> Please tell me where in the handbook it says you cannot go home on days you aren't scheduled.

## III. Law

### A. Summary Judgment Standard of Review

{¶ 42} Appellate review of a decision granting summary judgment is de novo. *Barley v. Fitcheard*, 8th Dist. Cuyahoga No. 91458, 2008-Ohio-6159, ¶ 12. Pursuant to Civ.R. 56(C), the party seeking summary judgment must prove that (1) there is no genuine issue of material fact; (2) they are entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Dresher v. Burt*, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996).

### B. Disability Discrimination — Ohio

{¶ 43} Anderson asserts that AccuScripts discriminated against her based on her disability in violation of R.C. 4112.01 et seq., by terminating her because of her

epilepsy. Ohio law, as codified in R.C. 4112.01 et seq., prohibits discrimination based on disability as follows:

> It shall be an unlawful discriminatory practice
>
> (A) For any employer, because of * * * disability * * * to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

R.C. 4112.01(A).

{¶ 44} To prevail on a claim of disability discrimination under Ohio law, a plaintiff must establish that: (1) he or she was disabled; (2) an adverse action was taken by the employer, at least in part, because he or she was disabled; and (3) he or she, although disabled, can safely and substantially perform the essential functions of the job in question. *Taylor v. Ohio Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 11AP-385, 2011-Ohio-6060, ¶ 19. If the plaintiff "establishes a prima facie case, the burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶ 14, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the employer articulates a nondiscriminatory reason, the burden shifts to the plaintiff to show "that the proffered reason was not the true reason" for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### 1. What is a Disability Under the Law?

{¶ 45} Ohio law defines a "disability" as a "physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." R.C. 4112.01(A)(13).

### a. Epilepsy as a Physical Impairment

{¶ 46} R.C. 4112.01(A)(16)(a)(iii) provides that a "physical or mental impairment" includes "[d]iseases and conditions, including, but not limited to * * * epilepsy * * *." Thus, under Ohio law, epilepsy qualifies as "physical or mental impairment."

### b. Substantially Limits

{¶ 47} "'A physical impairment, standing alone, does not necessarily constitute a disability * * *.'" *Fitzmaurice v. Great Lakes Computer Corp.*, 155 Ohio App.3d 724, 2004-Ohio-235, 803 N.E.2d 854, ¶ 12 (8th Dist.), quoting *Kirkendall v. United Parcel Serv., Inc.*, 964 F.Supp. 106, 109 (W.D.N.Y. 1997). To constitute a disability, Anderson must demonstrate that her impairment "substantially limits" one or more of her major life activities. *Fitzmaurice* at *id.*, citing R.C. 4112.01(A)(13).

{¶ 48} The Ohio Supreme Court has held that "[t]he federal Americans with Disabilities Act ("ADA") is similar to the Ohio [disability] discrimination law. * * * We can look to regulations and cases interpreting the federal Act for guidance in our

interpretation of Ohio law." *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 573, 697 N.E.2d 204 (1998).

{¶ 49} "The term 'substantially limits' is not defined in the Ohio statutes or regulations, but it is defined by federal regulations." *Bare v. Fed. Express Corp.*, 886 F.Supp.2d 600, 609 (N.D.Ohio 2012), quoting R.C. 4112.01(A)(13).

{¶ 50} AccuScripts argues that we should look to a former federal definition of "substantially limits." Specifically, AccuScripts argues that "[i]n 2008, the ADA was amended to broaden the definition of disability and the scope of coverage." According to AccuScripts, because Ohio did not also amend R.C. Chapter 4112, "Ohio jurisprudence and federal case law prior to the [amended ADA] remain instructive to and controlling on the efficacy of [Anderson's] disability discrimination claim." We disagree.

{¶ 51} Notably, when congress amended the ADA, it did not alter the definition of disability. "The term 'disability' means, with respect to an individual * * * a physical or mental impairment that substantially limits one or more major life activities of such individual * * *." 42 U.S.C. 12102(1)(A). That language continues to be mirrored in R.C. 4112.01(A)(13).

{¶ 52} In *Barber v. Chestnut Land Co.*, 2016-Ohio-2926, 63 N.E.3d 609 (7th Dist.), the Seventh District Court of Appeals reviewed the issue of whether the plaintiff was disabled in a disability discrimination case. "The dispute is whether her impairment 'substantially' limited her work activity." *Id.* at ¶ 74. The *Barber* Court looked to "federal interpretations of the ADA in regulations and case law for

guidance in interpreting terms used in Ohio law in this field." *Id*. at ¶ 75. Specifically, the court applied "the regulatory definition existing at the time of the employee's * * * termination." *Id. See also Anderson v. Bright Horizons Children's Ctrs., L.L.C.,* 10th Dist. Franklin No. 20AP-291, 2022-Ohio-1031, ¶ 25 (noting that Ohio courts can consider the ADA and its amendments to interpret Ohio disability discrimination law); *Creveling v. Lakepark Industries*, 2021-Ohio-764, 169 N.E.3d 21, ¶ 42 (6th Dist.) (utilizing the amended definition of "substantially limits" for an employee who was terminated in 2017).

{¶ 53} Under the version of 29 C.F.R. 1630.2(j)(1) that was in effect in 2018, when Anderson was terminated, the definition of "substantially limits" is:

(i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

(iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. * * *

(vii) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

{¶ 54} The trial court's journal entry in the case at hand reflects that it applied an older definition of "substantially limits," stating that the term means that an individual is:

(i) Unable to perform a major life activity that the average person in the general population can perform, or

(ii) Significantly restricted as to the condition, manner or duration under which [the] individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Former 29 C.F.R. 1630.2(j)(1).

{¶ 55} The current definition of substantially limits, which was in effect in 2018 when Anderson was terminated, is "'much more lenient than the previous ADA standard.'" *Creveling*, 2021-Ohio-764, 169 N.E.3d 21, at ¶ 42, quoting *Miller v. Maryland Dept. of Natural Resources*, 813 Fed.Appx. 869, 875 (4th Cir.2020). We base our analysis on the current ADA definition of substantially limits.

## IV. Analysis

### A. Disabled as a Matter of Law

{¶ 56} There is no dispute that Anderson's epilepsy qualifies as a physical impairment, which is the first prong of establishing a disability under Ohio law. There is also no dispute that working, not to mention seeing, hearing, speaking, and breathing, are major life activities under Ohio law. The crux of this case is whether

Anderson's impairment "substantially limits" her performance of these major life activities.

{¶ 57} Given the broad definition of substantially limits, we find that Anderson's epilepsy substantially limits major life activities. Specifically, under 29 C.F.R. 1630.2(j)(1)(vii), "[a]n impairment that is episodic * * * is a disability if it would substantially limit a major life activity when active." It is undisputed that when Anderson is experiencing a seizure, she cannot work, see, speak, hear, and sometimes breathe.

{¶ 58} Upon review, we find that the trial court erred by determining that Anderson (1) "failed to submit evidence * * * as to whether her epilepsy substantially limited her major life activities * * *," and (2) "failed to demonstrate that she is disabled under the law."

{¶ 59} Accordingly, Anderson's first assignment of error is sustained.

**B. Genuine Issue of Material Fact**

{¶ 60} In light of our analysis and disposition of Anderson's first assignment of error, we review whether Anderson established a prima facie case of disability discrimination. As stated, Anderson's epilepsy is a disability under Ohio law. Furthermore, it is undisputed that Anderson was terminated, and Anderson testified that she was terminated because of her epilepsy.

{¶ 61} Turning to the *McDonnell Douglas* burden-shifting test, we further find that AccuScripts articulated a legitimate, nondiscriminatory reason for Anderson's termination — namely, attendance issues during her "probationary

period" of employment. Anderson then presented evidence that AccuScripts' proffered reason was pretextual, and the real reason was because of her epilepsy.

> A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times.

(Citations omitted.) *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000). *See also Lascu v. Apex Paper Box Co.*, 8th Dist. Cuyahoga No. 95091, 2011-Ohio-4407, ¶ 27.

{¶ 62} Construing the evidence in the light most favorable to Anderson, we find that there are genuine issues of material fact including whether AccuScripts' legitimate, nondiscriminatory reason for terminating Anderson was merely pretextual, and the real reason was because of Anderson's disability.

{¶ 63} Anderson averred that during her May 19, 2018 shift, she experienced an "aura" and told Bauman she was not feeling well. Anderson further testified that Bauman told her to go home. Bauman, on the other hand, testified that Anderson stated she was not feeling well, and Bauman told her to "go into the break room and sit down for a while and see." Bauman testified that she did not tell Anderson to go home. In other words, there is at least a question of fact whether Anderson left her shift with or without permission.

{¶ 64} Accordingly, Anderson's second assignment of error is sustained.

## V.  Conclusion

{¶ 65} In conclusion, we hold that the trial court erred by determining that there was no genuine issue of material fact, and AccuScripts was entitled to judgment as a matter of law.

{¶ 66} Judgment reversed.  This case is remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

ANITA LASTER MAYS, P.J., and
MARY EILEEN KILBANE, J., CONCUR