[Cite as *Snyder v. U.S. Bank Natl. Assn.*, 2024-Ohio-2727.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| MARK SNYDER, | : | APPEAL NO. C-230494 |
| | | TRIAL NO. A-2001590 |
| Plaintiff-Appellant, | : | |
| vs. | : | |
| U.S. BANK NATIONAL ASSOCIATION, | : | *O P I N I O N.* |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: July 19, 2024

*Lindorst & Dreidame* and *Barry F. Fagel*, for Plaintiff-Appellant,

*Jackson Lewis P.C., Patricia Anderson Pryor* and *Jesse K. Daley,* for Defendant-Appellee.

**Bock, Presiding Judge.**

{¶1}   In this employment-discrimination case, plaintiff-appellant Mark Snyder maintains that his former employer, defendant-appellee U.S. Bank National Association ("U.S. Bank"), denied his requests for reasonable accommodations and fired him in retaliation for his second request for medical leave. We hold that genuine issues of material fact exist involving whether Snyder's impairments substantially limited his major life activities and whether U.S. Bank denied his requests for reasonable accommodations. We sustain Snyder's first assignment of error and reverse the trial court's summary judgment in U.S. Bank's favor on Snyder's failure-to-accommodate claim.

{¶2}   We overrule Snyder's second assignment of error and affirm the trial court's grant of summary judgment on his retaliation claim because the record demonstrates that U.S. Bank terminated his employment because of legitimate, nondiscriminatory reasons.

## I. Facts and Procedure

{¶3}   Snyder began working for U.S. Bank in 2002 as a financial analyst and worked his way up to Finance Director. As Finance Director, he was responsible for financial reporting, analytics, and profitability. In this leadership role, Snyder was responsible for "lead[ing] and direct[ing] analysts to perform and document tests of these models." He communicated "financial reports, modeling assumptions, performance results, and forecasting to senior management, auditors, and regulators." In performance reviews, Snyder's manager ("Manager") noted his "exceptional leadership" and that he was "receptive and responsive" to coaching.

{¶4}   In 2017, Snyder began having legal issues. In February 2017, he was charged with aggravated menacing for allegedly brandishing a gun during an

argument with his ex-girlfriend's mother—he pleaded guilty to a reduced charge and was placed on probation. Snyder acknowledged in a deposition that he failed to notify U.S. Bank about the arrest. While on probation, Snyder asked the trial court for permission to travel to Toronto in October 2017 for a work meeting, but that request was denied. In January and February 2018, the trial court issued capias warrants for probation violations. The trial court convicted Snyder of violating his probation in March and April 2018.

{¶5}    In October 2017, Snyder had a meeting with Manager because Snyder "was a no show to a standing meeting mid-morning with little excuse for being late." Manager noted that Snyder was defensive and failed to take responsibility. Later that day, Snyder was found "pass[ed] out at a gas station" after using cocaine in Clermont County and was arrested. In April 2018, Snyder was formally charged with felony drug possession and OVI. Later, in November 2018, he pleaded guilty to both charges.

*Snyder took FMLA leave*

{¶6}    U.S. Bank granted Snyder leave under the Family and Medical Leave Act ("FMLA") from October 11 through November 3, 2017, for an unspecified "health condition." Medical records indicate that on October 23, 2017, Snyder fell and struck his head on a kitchen countertop, rendering him unconscious. Snyder had suffered a stroke and was admitted to the hospital for three days. His discharge papers indicated that doctors diagnosed Snyder with palsy on the right side of his face. Testing revealed that Snyder had cocaine in his system, and he was taking medication to treat an existing anxiety diagnosis. During his FMLA leave, Snyder was admitted to Beckett Springs, a behavioral-health hospital, where he was diagnosed with recurrent and severe major depressive disorder, generalized anxiety disorder, and hypertension.

{¶7}     Snyder and Manager discussed over email Snyder's return to the office. They agreed that Snyder would return to work on January 31, 2018, and his schedule would consist of half days for two weeks, "a mixture of work from home and office as we agree." Then, there would be "ongoing work flexibility following the initial two weeks to accommodate ongoing physical and speech therapy."

{¶8}     Snyder sent Manager pages from a University of Cincinnati Neuroscience Institute pamphlet, which identified the areas of Snyder's brain affected by the stroke, including his cerebellum and frontal and occipital lobes. The pamphlet identified behaviors associated with injuries to these areas of the brain. Frontal lobe injuries may cause behavioral and personality changes, mood swings, irritability, impulsiveness, a lack of focus, impaired judgment, and difficulty with problem solving. An occipital lobe injury may cause defects in vision, blurred vision, and difficulty reading and writing. An injured cerebellum may cause problems with walking, coordinating movements, vertigo, and slurred speech.

### *Snyder returned to work*

{¶9}     Though Snyder was initially scheduled to return to work in January 2018, one of his subordinates discovered his criminal charges, which prompted a human-resources investigation and delayed his return until the following month.

{¶10}   He returned in what Manager described as a "transitional period." Snyder worked reduced hours from home during his first two weeks back at work. Manager testified that Snyder "was going to require appointments for continuing therapy, and he was going to have two weeks requested for a lower number of hours." He knew Snyder needed "[p]hysical [and] speech" therapy. Manager also knew that Snyder had vision and eye issues. Specifically, Snyder's eyelid "didn't function properly, and he was going to have a weight put into the eyelid to help it close."

4

**{¶11}** Snyder testified at his deposition that he tried to show Manager the stroke pamphlet, but Manager was not interested. Manager testified that he could not "recall [Snyder] giving me this document." Snyder and Manager both testified that Snyder posted the stroke pamphlet at his desk when he returned to work.

**{¶12}** In early February 2018, Snyder told Manager that he needed to see a doctor the next day because his "BP ha[d] been spiking and erratic all week." Apparently, on February 14, 2018, Snyder's ex-wife informed U.S. Bank that Snyder was sick and needed to take off the following day. Manager later discovered that Snyder had a "legal obligation" on February 15, 2018.

### *March 2018 one-on-one meeting*

**{¶13}** Snyder was scheduled to meet with Manager in March 2018 to discuss "leadership concerns," but Snyder did not show up. Days later, Snyder and Manager discussed Snyder's "combative" tone and his attendance. Manager's notes cited instances where Snyder was late to meetings and expressed displeasure about Snyder requesting "sick time when he was in jail."

**{¶14}** According to Manager, Snyder "took a victim role and completely misinterpreted guidance given to him." Manager's notes stated that Snyder took "advantage of the office by working an unpredictable and unapproved schedule." Manager considered the discussion of his schedule an "affirmation that things were not back to normal."

**{¶15}** The notes chronicled exchanges between Snyder and his subordinates that Manager described as "inappropriate, divisive[,]" and lacking good judgment.

**{¶16}** The notes also indicate that Snyder apologized for his tone while also explaining that his "medical condition complicated things as he was still healing from one issue and now had another issue with his eye." Snyder felt "overwhelmed." Snyder

5

assured Manager that his attendance issues "would all be over in two weeks" after physical therapy was complete. Manager described it as "an odd meeting."

*April 2018 one-on-one meeting*

**{¶17}** At an April 2018 meeting, Snyder and Manager discussed "the same issues of communication, predictable schedule, and combative behavior." Manager noted that Snyder remained "not aligned" following the March one-on-one meeting. According to the notes, Snyder continued to work from home and informed Manager's assistant that he had upcoming appointments for an issue with his eye. Manager noted that "all flexible schedule/time off needs to be communicated to me and signed in advance," though "[t]his does not apply to illness where you take time as your personal situation dictates."

**{¶18}** Manager's notes state that Snyder became combative when Manager asked about the status of a work project. The notes reference complaints from a bank teller and branch manager about Snyder's combative behavior. And they reference another employee's complaint that Snyder "pursued them twice in an awkward way" after being told politely that his "feedback was unwelcome."

*U.S. Bank warned, and then fired, Snyder*

**{¶19}** In early May 2018, U.S. Bank issued to Snyder an ethics-and-business-conduct warning to "articulate the deficiencies we have discussed and clarify the type of improvements you will need to demonstrate to meet specific expectations." Relevant here, the warning explained that Snyder had asked to work from home in April 2018, but Manager had denied that request. The warning explained that Snyder had failed to comply with U.S. Bank's respect, attendance, and absenteeism policies. It warned that if Snyder failed to meet expectations, he could face "further disciplinary action, up to and including termination." In response, Snyder emailed Manager, "I

6

understand the reasoning and have a grasp on the expected performance."

{¶20} When Manager took a vacation in late May 2018, Manager's assistant monitored Snyder's attendance. Her notes, which she provided to Manager, reflect an inconsistent schedule. They also indicate that on one day, Snyder blocked a few hours on his calendar and on another day, he "sat alone in [the] conference room."

{¶21} In early June 2018, Manager sent Snyder those notes and asked him to respond. Later that day, Manager's assistant emailed Manager explaining that Snyder "confronted me again." According to the assistant, Snyder waited until Manager left the office and then commented to the assistant, "I wish you wouldn't have lied, I really do." In her email, she remarked that "the look in his eye was not good."

{¶22} That night, Manager emailed human resources because he believed Snyder's behavior was unacceptable and "consistent with his issues of attempting to intimidate people." Manager felt that the situation was "not redeemable" and warranted action.

{¶23} The following day, Snyder was admitted to a hospital for "[a]djustment disorder with depressed mood" and "[s]uicidal thoughts." Snyder's ex-wife had contacted the police with concerns that Snyder would attempt self-harm and was suffering from a "nervous breakdown" at a casino. His medical records indicated that Snyder complained of "foggy thoughts," appeared confused and anxious, and showed "concerning signs and symptoms of prolonged depression that may be further impacted by recent stroke." His records indicated that medical providers instructed him to engage in therapy, consistently take lithium, and follow up with his primary care physician to "rule out continued neurocog stroke related issues." The next day, Snyder asked for, and was granted, a leave of absence from U.S. Bank.

**{¶24}** Later in June 2018, Snyder was on leave and emailed Manager about an "[u]nscheduled phone call." Snyder was "parking to go to a therapy appointment" and was "not sure what was stated on the call." Citing his "mental disability" that affected his ability to "process things quickly," Snyder asked for an in-person meeting. Days later, Snyder received a letter terminating his employment with U.S. Bank.

### Snyder sued U.S. Bank

**{¶25}** In May 2020, Snyder sued U.S. Bank. Relevant here, Snyder alleged that U.S. Bank discriminated against him in violation of Ohio law when it failed to engage in an interactive process, failed to accommodate his disability, and fired him in retaliation for requesting medical leave. After U.S. Bank removed the case to federal court, the federal district court granted U.S. Bank summary judgment on Snyder's federal claims and remanded the case to the trial court to address Snyder's state-law claims. *See Snyder v. U.S. Bank Natl. Assn.*, S.D.Ohio No. 1:20-cv-392, 2022 U.S. Dist. LEXIS 54998, 11 (Mar. 28, 2022), *aff'd*, 6th Cir. No. 22-3385, 2022 U.S. App. LEXIS 32984, 5 (Nov. 29, 2022).

**{¶26}** Back in the Hamilton County Court of Common Pleas, U.S. Bank moved for summary judgment on Snyder's remaining state-law claims. U.S. Bank relied on Snyder's and Manager's deposition testimony, and many exhibits. U.S. Bank argued that Snyder's failure-to-accommodate claim should fail because Snyder could neither establish that he was disabled nor show that he was denied a reasonable accommodation primarily because Snyder testified during his deposition that he "could do this job." Turning to his retaliation claim, U.S. Bank argued that Snyder could not show a causal connection between his request for leave and his termination.

**{¶27}** Snyder, however, argued that genuine issues of material fact existed regarding (1) his depression and anxiety as cognizable disabilities, (2) whether U.S.

8

Bank failed to accommodate his ocular and mental-health issues when it denied his requests for a larger monitor and to work from home, and (3) the causal connection between his request for accommodations and his termination.

**{¶28}** The trial court granted U.S. Bank summary judgment on Snyder's claims. Beginning with the reasonable-accommodation claim, the trial court found that "[t]he record is devoid of facts that tend to establish any substantial limitation on Plaintiff's major life activities." Turning to Snyder's retaliation claim, the court found no causal link between Snyder engaging in protected activity and U.S. Bank terminating his employment. The trial court explained in its retaliation analysis that U.S. Bank indisputably provided Snyder accommodations.

**{¶29}** Snyder appeals that decision and raises two assignments of error.

## II. Law and Analysis

**{¶30}** We review the trial court's decision to grant summary judgment to U.S. Bank de novo. *Wsb Rehab. Servs. v. Cent. Accounting Sys.,* 1st Dist. Hamilton Nos. C-210454 and C-210467, 2022-Ohio-2160, ¶ 22. Under Civ.R. 56, summary judgment is proper when the moving party shows (1) the absence of genuine issues of material fact, (2) it is entitled to judgment as a matter of law, and (3) construing the evidence in the nonmoving party's favor, reasonable minds can only reach a conclusion adverse to the nonmoving party. *Id.* at ¶ 22, quoting *Holloman v. Permanent Gen. Assur. Corp.,* 1st Dist. Hamilton No. C-180692, 2019-Ohio-5077, ¶ 8.

### A. Genuine issues of material fact exist preventing summary judgment on Snyder's failure-to-accommodate claim

**{¶31}** In his first assignment of error, Snyder argues that the trial court erred by granting U.S. Bank's summary-judgment motion on his failure-to-accommodate

claim. He asserts that he had a substantial impairment that affected his ability to work, and that U.S. Bank did not provide the reasonable accommodations he requested.

**{¶32}** Snyder sued U.S. Bank for violations of the Ohio Civil Rights Act ("the Act"), which prohibits an employer from discharging or otherwise discriminating against a person involving "any matter directly or indirectly related to employment" because of a person's disability and without just cause. R.C. 4112.02(A).

**{¶33}** Because the Act was "modeled after the federal Americans with Disabilities Act ('ADA'), Ohio courts may seek guidance when interpreting the Ohio [disability]-discrimination statute from regulations and cases that interpret the ADA." *Pflanz v. City of Cincinnati*, 149 Ohio App.3d 743, 2002-Ohio-5492, 778 N.E.2d 1073, ¶ 12 (1st Dist.). Employment-discrimination laws are remedial, and courts must construe them liberally to accomplish their purpose of preventing and eliminating discrimination. *Dworning v. City of Euclid*, 119 Ohio St.3d 83, 2008-Ohio-3318, 892 N.E.2d 420, ¶ 27, quoting R.C. 4112.08.

**{¶34}** As part of this prohibition on disability discrimination, an employer must make reasonable accommodations for a person with a disability who is otherwise qualified for the position, unless the employer can show that accommodation would be an undue hardship to the employer's business. *See Bibee v. Gen. Revenue Corp.*, 2013-Ohio-1753, 991 N.E.2d 298, ¶ 6 (1st Dist.), citing 42 U.S.C. 12112(b)(5)(A). This duty begins when the employee requests a reasonable accommodation. *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 621 (5th Cir.2009); *see Anderson v. Bright Horizons Children's Ctrs., LLC*, 10th Dist. Franklin No. 20AP-291, 2022-Ohio-1031, ¶ 67. Once an employee makes a prima facie showing that the employer failed to make reasonable accommodations, the burden shifts to the employer to demonstrate

that the requested accommodation would create an undue hardship on the employer's business. Ohio Adm.Code 4112-5-08(E)(1); *see Bright Horizons* at ¶ 64.

**{¶35}** To make a prima facie showing that U.S. Bank failed to reasonably accommodate his disability, Snyder had to demonstrate that (1) he was disabled; (2) he was otherwise qualified for the position, either with or without accommodations; (3) U.S. Bank knew, or should have known, about his disability; (4) Snyder requested an accommodation; and (5) U.S. Bank failed to provide the accommodation. *Coomer v. Opportunities for Ohioans with Disabilities*, 10th Dist. Franklin No. 21AP-158, 2022-Ohio-387, ¶ 17, citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir.2004).

**{¶36}** At issue is whether Snyder had a cognizable disability and whether U.S. Bank accommodated Snyder. We note issues of U.S. Bank's notice of Snyder's disability or his need for an accommodation, and whether Snyder was a "qualified individual," are not before this court.

1. *Whether Snyder had a "disability" is a genuine issue of material fact*

**{¶37}** The parties dispute whether Snyder's stroke-induced physical and mental impairments substantially limited a major life activity.

a. Ohio law prohibits disability discrimination

**{¶38}** Relevant here, "disability" is defined by the statute as

a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.

R.C. 4112.01(A)(13).

11

{¶39}  Because the Act does not define "substantially limits," we look to federal law to guide our analysis. *Pflanz*, 149 Ohio App.3d 743, 2002-Ohio-5492, 778 N.E.2d 1073, at ¶ 16.

{¶40}  The trial court correctly recognized that depression and anxiety can constitute disabilities as defined by the Act. *See* R.C. 4112.01(A)(16) (" 'physical or mental impairment' includes * * * [a]ny mental or physiological disorder, including, but not limited to * * * emotional or mental illness * * * disabilities"). The trial court, citing *Barber v. Chestnut Land Co.,* 2016-Ohio-2926, 63 N.E.3d 609 (7th Dist.), determined that Snyder needed to show that his claimed disabilities—depression, anxiety, and eye issue—substantially limited his work activity.

### b. "Substantially limits [a] major life activit[y]" is interpreted broadly

{¶41}  The ADA Amendments Act of 2008 ("ADAAA") rejected a trio of United States Supreme Court opinions that had narrowly and strictly construed the meaning of a "disability." *See* 42 U.S.C. 12102(4)(A)-(B); *see also Barlia v. MWI Veterinary Supply, Inc.,* 721 Fed.Appx. 439, 445 (6th Cir.2018). While the *Barber* court recognized as much, it applied a pre-ADAAA substantial-limitation standard because the employer's actions "occurred prior to the enactment of the new regulations" that redefined a substantial limitation, and "the parties d[id] not ask for the application of the new federal statutory standards." *Barber* at ¶ 86.

{¶42}  As explained in *Barber,* before the enactment of the ADAAA and its related regulations, establishing a substantial limitation required employees to show that they were " ' "[u]nable to perform a major life activity that the average person in the general population can perform" ' or that the employee was ' "[s]ignificantly restricted as to the condition, manner or duration under which an individual can

12

perform a particular major life activity." ' " *Id.* at ¶ 76, quoting S*utton v. United Air Lines, Inc.,* 527 U.S. 471, 480, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), quoting former 29 C.F.R. 1630.2(j)(1)(i)-(ii).

**{¶43}** But Congress rejected that interpretation when it passed the ADAAA. Under the ADAAA, an impairment need only "substantially limit the ability of an individual to perform a major life activity as compared to most people in the general population. It need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Creveling v. Lakepark Industries*, 2021-Ohio-764, 169 N.E.3d 21, ¶ 42 (6th Dist.), quoting *Miller v. Maryland Dept. of Natural Resources*, 813 Fed.Appx. 869, 875 (4th Cir.2020), quoting 29 C.F.R. 1630.2(j)(1)(ii). Ohio courts have adopted the ADAAA's definition of a substantial limitation. *E.g.*, *id.*; *Anderson v. AccuScripts Pharmacy, L.L.C.*, 8th Dist. Cuyahoga No. 110261, 2022-Ohio-1663, ¶ 54

**{¶44}** The ADAAA requires the degree of an employee's functional limitation to be "lower than the standard for 'substantially limits' applied" before the ADAAA. *Neely v. Benchmark Family Servs.*, 640 Fed.Appx. 429, 434 (6th Cir.2016), quoting 29 C.F.R. 1630.2(j)(1)(iv). Now, courts must construe "substantially limits" "broadly in favor of expansive coverage." 29 C.F.R. 1630.2(j)(1)(i). This "is not meant to be a demanding standard." *Id.* Because the primary inquiry is whether an entity discriminated against an employee or complied with its obligations, the threshold issue of whether an employee's impairment substantially limited the employee's major life activities does "not demand an extensive analysis." 29 C.F.R. 1630.2(j)(1)(iii). This standard is " 'much more lenient than the previous ADA standard.' " *Creveling* at ¶ 42, quoting *Miller* at 875.

{¶45} Determining whether a physical or mental impairment substantially limits a major life activity requires an "individualized assessment." 29 C.F.R. 1630.2(j)(1)(iv). Under R.C. 4112.01(13), a disability is an impairment that substantially limits an employee's "major life activity," "including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." We construe this as a nonexhaustive list of major life activities because the word "include" may show that a list is illustrative, not comprehensive. *State v. Reed*, 162 Ohio St.3d 554, 2020-Ohio-4255, 166 N.E.3d 1106, ¶ 15, quoting *Samantar v. Yousuf*, 560 U.S. 305, 317, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010); *see Black's Law Dictionary* 777 (8th Ed. 2004) ("The participle *including* typically indicates a partial list."). Federal regulations go further and define major life activities as "reading, concentrating, thinking, communicating, interacting with others," and the "operation of major bodily functions." 29 C.F.R. 1630.2(i)(1). Major bodily functions include neurological and brain functions. 29 C.F.R. 1630.2(i)(1)(ii).

{¶46} An "impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment." 29 C.F.R. 1630.2(j)(1)(vii). Indeed, employees may demonstrate that they are disabled for ADA purposes by simply showing that the impairment substantially limits any major life activity, not necessarily that it affects their work. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir.1998). Courts have held that the major life activity of working should be considered as "a last resort." *Carter v. Pathfinder Energy Servs., Inc.,* 662 F.3d 1134, 1146 (10th Cir.2011), quoting *E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1162 (10th Cir.2006), fn. 5.

{¶47} To determine whether a plaintiff's physical and mental impairments substantially limit a plaintiff's major life activity, courts should consider "the condition

under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity." 29 C.F.R. 1630.2(J)(4)(i). This includes the difficulty and effort to perform the activity and "pain experienced when performing a major life activity." 29 C.F.R. 1630.2(J)(4)(ii). And "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 29 C.F.R. 1630.2(J)(4)(iii).

{¶48} Significantly, there are some instances in which courts "should easily" conclude that by its nature, an impairment imposes a substantial limitation on a major life activity, rendering the individualized assessment simple and straightforward. 29 C.F.R. 1630.2(J)(4)(iv). Indeed, certain impairments should "virtually always" be found to be a substantial limitation on a major life activity. 29 C.F.R. 1630.2(J)(3)(ii). One such impairment specifically listed by the regulations is major depressive disorder, which substantially limits brain function. 29 CFR 1630.2 (J)(3)(iii). Some federal district courts have construed "virtually always" and "should easily be concluded" as creating "a strong presumption" that severe depression and anxiety substantially limit "a wide range of major life activities." *See Williams v. AT&T Mobility Servs., LLC*, 186 F.Supp.3d 816, 825 (W.D.Tenn.2016); *see also Dye v. Thomas More Univ., Inc.,* E.D.Ky. No. 2:19-CV-087-CHB, 2021 U.S. Dist. LEXIS 166894, 25 (Sep. 2, 2021). The Fifth Circuit has held that a plaintiff-employee's declaration detailing her "trouble sleeping, thinking, focusing, communicating, and caring for herself" is sufficient to create a genuine issue of material fact about whether her depression was substantially limiting "[i]n light of the relatively low bar created by the substantially-limits and summary-judgment standards." *Williams v. Tarrant Cty. College Dist.*, 717 Fed.Appx. 440, 448 (5th Cir.2018).

c. A genuine issue of material fact exists involving whether Snyder's impairments substantially limited a major life activity

{¶49} The trial court recognized, and the parties do not dispute, that anxiety and depression constitute a "mental impairment." And in his response to U.S. Bank's summary-judgment motion, Snyder also argued that U.S. Bank refused to accommodate his "eye condition." As he explained in his deposition, he had a piece of metal in his eye, was unable to keep his eye open, and required intermittent breaks because of pain in his eye when viewing his monitor. This is a physical impairment because it is a physiological condition affecting his musculoskeletal system and sense organ. *See* R.C. 4112.01(A)(16)(a)(i); *see also* 29 C.F.R. 1630.2(h).

{¶50} The trial court appeared to improperly employ the more stringent, pre-ADAAA standard to determine whether Snyder presented evidence of a substantial impairment sufficient to withstand summary judgment. It did not mention Snyder's alleged eye impairment. And it appeared to confine its substantial-limitation inquiry to the major life activity of working. But to prove a disability, Snyder only had to show that his physical and mental impairments substantially limited one major life activity, which need not be his work. 29 C.F.R. 1630.2(j)(1)(vii).

{¶51} Applying current law, considering all of Snyder's alleged impairments, and construing the record most strongly in Snyder's favor, as we must, we hold that genuine issues of material fact exist as to whether Snyder's stroke exacerbated his anxiety and depression to the point where it substantially limited his brain functioning, and whether Snyder's eye condition substantially limited his ability to see, focus, and read without pain.

{¶52} Beginning with his anxiety and depression, we conclude that a reasonable fact finder could determine that these mental impairments substantially

limited a major life activity. Snyder testified that after his stroke he was "easily agitated" and felt more depressed and anxious. His medical records show he was diagnosed with severe major depressive disorder. His stroke pamphlet indicates that he suffered strokes in both hemispheres of his brain. The pamphlet suggests that Snyder's frontal lobe was affected by the stroke, which could result in difficulty problem solving, changes in social behavior, and personality changes. The pamphlet contained check marks and annotations in the emotional-health section, and showed that 30 percent of stroke survivors experience isolation, being easily irritated, and feelings of hopelessness and panic. It states that, following a stroke, a person's mood and behavior may be affected in "unexpected ways."

{¶53} Many of Manager's notes following his and Synder's meetings track those symptoms. Manager expressed concerns over Snyder's "[c]ombative email/ST messages/tone management," and stated that Snyder "completely misinterpreted guidance given to him." Manager noted that Snyder had an unacceptable conversation with subordinates, and a "[p]eculiar conversation" with another. And Manager described Snyder's behavior and the conversation as "odd," noting that Synder had a "lack of self-awareness."

{¶54} The regulations and case law instruct that when an employee experiences severe depression, courts should "virtually always" easily conclude that the employee's major depressive disorder affects a major life function. And considering Snyder's diagnosis and evidence of behavioral changes, we disagree with the trial court's conclusion that the record was "devoid of facts" establishing a substantial limitation on Snyder's major life functions.

{¶55} Moreover, Snyder's eye condition is a physical impairment that substantially limited his ability to see and read without pain. His medical records

17

indicated that the stroke caused Snyder to fall, which resulted in "Peripheral Right CN VII Palsy." He testified that he experienced eye pain and "couldn't keep [his] eye open" when looking at his monitor and needed to take breaks. When compared to the general population, reasonable people could find that the difficulty and pain Snyder experienced constituted a substantial limitation on his ability to see and read.

{¶56} U.S. Bank maintains that Snyder's deposition statements dispositively demonstrate that his ability to work was not impaired. To be sure, counsel asked Snyder whether he understood in late June 2018 that he was fired and he answered that he "could do this job" and "became disabled after what happened at the bank." And when Snyder prefaced a few answers with "when I was disabled," counsel asked him to clarify what he meant by that statement. Snyder answered that he felt "as though I became disabled on June 4," 2018. He testified that he was not disabled before that date. But he immediately clarified, "I mean I was -- absolutely." At other points, Snyder also noted that he could "absolutely do the job."

{¶57} In an affidavit submitted to supplement his deposition testimony, Snyder explained that his statements were referring to a "total disability," and that he had a partial disability before June 2018. U.S. Bank argues that Snyder's affidavit should not be considered because it contradicts his deposition. "[A]n affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat a motion for summary judgment." *Byrd v. Smith,* 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 28. But Snyder's affidavit is consistent with his statement "I was  -- absolutely" disabled before his termination date.

{¶58} Moreover, Snyder's statements that he was able to do his job do not conclusively establish the absence of a substantial limitation. First, there is a genuine

issue of material fact involving whether his impairments substantially limited his brain functioning, ability to read, and ability to concentrate. His impairments need not substantially limit Synder's ability to work to be considered a substantially-limiting impairment. *See* 29 C.F.R. 1630.2(j)(1)(vii).

{¶59} Second, an employee's impairment does not need to "prevent, or significantly or severely restrict" the performance of a major life activity. 29 C.F.R. 1630.2(j)(1)(ii); *see EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 619 (5th Cir.2009) ("Netterville's ability to perform her job while experiencing her CFS symptoms has no bearing on the determination of whether she was disabled under the ADA.").

{¶60} Third, in addition to demonstrating a substantial limitation, an employee alleging a disability-discrimination claim must be a "qualified individual"— the employee, "with or without reasonable accommodation[s,]" must be able to perform the position's essential job functions. *Pflanz,* 149 Ohio App.3d 743, 2002-Ohio-5492, 778 N.E.2d 1073, at ¶ 34. Requiring an employee to be completely unable to perform the job, with or without accommodation, would run headlong into the requirement that an employee must be a "qualified individual" and create a "quandary" for employees alleging disability discrimination. *See Calero-Cerezo v. United States DOJ,* 355 F.3d 6, 22 (1st Cir.2004).

{¶61} Finally, U.S. Bank argues that Snyder asserted that his stroke created his disability, that evidence exists he was diagnosed with anxiety and depression before his stroke, and that Snyder may not amend his claim and rely on his pre-stroke mental-health issues to establish a disability. But Snyder's medical records state that his depression and anxiety were "further impacted by [his] recent stroke." The

evidence of Snyder's post-stroke behavior is consistent with the notion that his stroke worsened his depression and anxiety.

{¶62} We hold that there is a genuine issue of material fact involving whether Snyder's anxiety and depression substantially limited his brain functioning, and whether his eye condition substantially limited his ability to read and concentrate. The evidence in the record, when construed in Snyder's favor, meets this less-then-demanding standard.

2. *A genuine issue of material fact exists involving whether U.S. Bank reasonably accommodated Snyder*

{¶63} The trial court stated that U.S. Bank had "indisputably provided" Snyder's requested accommodations in its retaliation-claim analysis. Snyder argues that a genuine issue of material fact exists regarding whether his accommodation requests were ignored or denied. In response, U.S. Bank contends that the requested accommodations were unreasonable.

{¶64} Snyder testified in his deposition that he requested a flexible schedule—"in week one, maybe week two"—to accommodate his medical appointments. Snyder also requested to work from home both to accommodate his medical appointments and to help alleviate what he perceived as a hostile work environment. Snyder testified that these requests to work from home on specific days were denied. Manager's deposition, along with the letter warning Snyder of U.S. Bank's expectations and consequences for failing to meet those expectations, both indicate that during a one-on-one meeting, Snyder asked to work from home, but Manager denied his request.

{¶65} Moreover, Snyder's deposition testimony described conversations with Manager's assistant about his eye condition. He requested a larger monitor and a workspace away from the window to minimize glare. He also informed her that he

needed "smaller breaks" because of his "eye pain." But, he explained, "I did not get accommodations for that."

**{¶66}** We hold that a genuine issue of material fact exists involving whether those requests were reasonable and whether U.S. Bank provided reasonable accommodations. While U.S. Bank accommodated Snyder when he first returned to work, the evidence, when viewed in Snyder's favor, indicates that it denied his later requests for accommodations. A "[r]easonable accommodation under the ADA is a process, not a one-off event." *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir.2013). And being that a larger monitor, moving away from a window, taking short breaks to alleviate eye pain, and working from home are not unreasonable requests as a matter of law, the trial court erred by finding that U.S. Bank "indisputably provided" these accommodations.

**{¶67}** In sum, a genuine issue of material fact exists involving whether Snyder's impairments substantially limited his major life activities and whether U.S. Bank failed to provide Snyder reasonable accommodations. We sustain Snyder's first assignment of error and reverse the trial court's summary judgment in U.S. Bank's favor on Snyder's failure-to-accommodate claim.

### B. The trial court properly granted summary judgment on Snyder's retaliation claim

**{¶68}** In his second assignment of error, Snyder asserts that the trial court erroneously granted U.S. Bank summary judgment on his retaliation claim, arguing that a genuine issue of material fact exists involving whether U.S. Bank fired him for requesting accommodations.

21

   1. *Retaliatory-discharge claims are analyzed under a burden-shifting framework*

**{¶69}** To establish a prima facie claim of retaliation, Snyder must show that "(1) he engaged in protected activity; (2) his employer knew that he had engaged in that activity; (3) the employer took adverse action against him; and (4) a causal connection existed between the protected activity and the adverse employment action." *Greene v. City of Cincinnati,* 1st Dist. Hamilton No. C-070830, 2008-Ohio-4908, ¶ 22, citing *Greer-Burger v. Temesi,* 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶ 13. An employee may establish a retaliatory-discharge claim through either direct or indirect evidence. *See Barber*, 2016-Ohio-2926, 63 N.E.3d 609, at ¶ 47.

**{¶70}** Snyder presented indirect evidence of retaliatory discharge. Absent direct evidence of an employer's retaliatory intent (e.g., an employer admitting that it fired an employee based on seeking reasonable accommodations), if an employee successfully presents a prima facie case of retaliation, the burden shifts to the employer to state a nondiscriminatory reason for the adverse employment action. *Barber* at ¶ 48-49. And if the employer meets its burden to demonstrate a legitimate reason for the adverse action, the burden returns to the employee to show that the employer's reason for the adverse employment action was pretextual. *Id.* at ¶ 50.

**{¶71}** Only the causation element is at issue in this case. To establish causation, an employee must show that the "protected activity was a but-for cause of the alleged adverse action by the employer." *McGuire v. City of Newark*, 5th Dist. Licking No. 2019 CA 00095, 2020-Ohio-4226, ¶ 98, quoting *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir.2014). Said differently, an employee's employment-discrimination claim will fail if the evidence shows that the employer would have made the same adverse-employment action " 'regardless of the plaintiff's

participation in the protected activity.' " *Widmyer v. Steak 'n Shake Operations, Inc.*, 1st Dist. Hamilton No. C-140051, 2014-Ohio-5413, ¶ 23, quoting *Neal v. Hamilton Cty.,* 87 Ohio App.3d 670, 678, 622 N.E.2d 1130 (1st Dist.1993).

**{¶72}** Establishing causation requires producing "sufficient evidence to support an inference that [the employee's] protected activity was likely the reason for the adverse [employment] action." *Greene*, 1st Dist. Hamilton No. C-070830, 2008-Ohio-4908, at ¶ 23. While causation can be shown with evidence that the employer knew of the protected activity combined with the temporal proximity of events, "timing alone is not sufficient to show a causal connection." *Widmyer* at ¶ 23.

### 2. *Snyder failed to show that U.S. Bank's justification for firing him was pretext*

**{¶73}** Assuming without deciding that Snyder satisfied his burden of establishing a prima facie case of retaliation, we hold that U.S. Bank met its burden to present a legitimate, nondiscriminatory reason that caused Snyder's termination. Snyder was terminated because he continued to engage in behavior that violated U.S. Bank's attendance and respect policies. It is well established that absenteeism is a nondiscriminatory reason for an adverse employment action. *See Cleveland Civ. Serv. Comm. v. Ohio Civ. Rights Comm.*, 57 Ohio St.3d 62, 65, 565 N.E.2d 579 (1991) ("absenteeism * * * may be considered by an employer in making its hiring decision."). Snyder's interaction with Manager's assistant appears to have been the breaking point for Manager's decision to fire Snyder. While Snyder was hospitalized again and filed for leave shortly after his encounter with Manager's assistant, Manager had initiated the termination process the night of that encounter, before Snyder was hospitalized and before he requested a second leave of absence.

23

{¶74} Snyder is correct that the Ninth Circuit has held that "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination" and "the link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." *Humphrey v. Mem. Hosps. Assn.,* 239 F.3d 1128, 1140 (9th Cir.2001) ("a jury could reasonably find the requisite causal link between a disability of OCD and Humphrey's absenteeism and conclude that MHA fired Humphrey because of her disability.").

{¶75} But we agree with the Seventh Circuit, which has "drawn a distinction between an employee's disability and workplace misconduct resulting from that disability." *Tate v. Ancell*, 551 Fed.Appx. 877, 885 (7th Cir.2014). Indeed, the Seventh Circuit has reasoned that "an employee's disability will not preclude an employer from imposing discipline, up to and including discharge, for the employee's violation of a workplace rule, even when there is a connection between the disability and the violation." *Id.* So too here.

{¶76} Because Snyder's termination was caused by his conduct that was noncompliant with U.S. Bank's absenteeism and workplace-respect policies, we overrule his second assignment of error.

### III. Conclusion

{¶77} We sustain the first assignment of error, reverse the trial court's judgment on Snyder's failure-to-accommodate claim, and remand the cause to the trial court for further proceedings. We overrule the second assignment of error and affirm the trial court's judgment on Snyder's retaliation claim.

Judgment accordingly.

24

**ZAYAS** and **WINKLER, JJ.,** concur.

Please note:

       The court has recorded its entry on the date of the release of this opinion.